UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

KEVIN L. JOHNSTON          :
                           :
         v.                : C.A. No. 09-167S
                           :
URBAN LEAGUE OF RHODE      :
ISLAND, INC. and DENNIS B. :
LANGLEY                    :

## REPORT AND RECOMMENDATION

Lincoln D. Almond, United States Magistrate Judge

Plaintiff, Kevin L. Johnston, initiated this action on April 8, 2009 against his former employer, Urban League of Rhode Island, Inc., and his former supervisor, Dennis B. Langley – the Urban League's CEO – in his individual capacity. Plaintiff asserts several state and federal statutory claims of discrimination and retaliation. In particular, Plaintiff sues both Defendants under Rhode Island's Fair Employment Practices Act ("RIFEPA"), R.I. Gen. Laws § 28-5-1, et seq., alleging discriminatory failure to promote (Count I), retaliation (Count II) and disparate impact (Count V). Plaintiff additionally sues the Urban League under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., alleging discriminatory failure to promote (Count III), retaliation (Count IV) and disparate impact (Count VI). Finally, Plaintiff sues both Defendants for retaliation (Count VII) under Rhode Island's Whistleblowers' Protection Act ("RIWPA"), R.I. Gen. Laws § 28-50-1, et seq.

Defendants move for summary judgment as to all claims against them.[1] (Document No. 131). Plaintiff opposes the Motion. (Document No. 119). Defendants' Motion for Summary Judgment has been referred to me for preliminary review, findings and recommended disposition. See 28 U.S.C. § 636(b)(1)(B); LR Cv 72.

**Facts**

Plaintiff, a black male, began working for the Urban League in 1998. He submitted a resume which indicated that he attended American International College ("AIC") from 1985 to 1990 and earned a Bachelor's Degree in Business Administration. (Document No. 132-5). However, it is undisputed that the Urban League subsequently obtained a copy of Plaintiff's AIC academic transcript in January 2001 and learned that he only attended AIC for three semesters between 1980 and 1982 and did not graduate. (Document No. 132-14).

Although it appears that Plaintiff was given a free pass by the Urban League for his resume fraud, it is undisputed that Plaintiff was disciplined for other performance issues later in 2001. Plaintiff was suspended without pay for four days in August 2001 (Document Nos. 132-7 and 132-8) and, in October 2001, placed on "probation" for two and one-half months expiring at the end of 2001. (Document No. 132-9).

Plaintiff held a number of positions during his tenure with the Urban League. At the time of his termination, Plaintiff worked as a Coordinator in the Advocacy and Public Policy ("APP") Unit. By letter dated February 14, 2007, Plaintiff filed a "formal complaint" with Ms. Leslie

---

[1] In his Opposition, Plaintiff advised the Court that he no longer wishes to pursue his disparate impact claims (Counts V and VI) and that they are voluntarily withdrawn. (Document No. 122 at p. 1). Since Plaintiff has not moved for voluntary dismissal under Rule 41(a)(2), Fed. R. Civ. P., and has not responded to Defendants' Motion for Summary Judgment on Counts V and VI, I recommend that Defendants' Motion be GRANTED as to those counts and that they be dismissed with prejudice.

Thompson, the Urban League's Director of Human Resources, regarding the recent promotion of a white, female co-worker, Ms. Patricia DiPrete, to the position of Director of the APP Unit. (Document No. 132-21). Plaintiff alleged that he was not given the opportunity to apply for the Director position, that he was a more experienced and better-qualified candidate and that the selection of Ms. DiPrete over him constituted both race and gender discrimination. Id.[2] Plaintiff described his complaint as a "prelude to legal action" and requested a "fair and expedient settlement" on the "advice of counsel." Id.

At some point later in February 2007, Plaintiff sent another letter to the Chairman of the Urban League's Board, Mr. Norman Orodenker, similarly claiming discrimination and unfair treatment and requesting a meeting. (Document No. 128-1 at p. 42). Plaintiff indicated that he had discussed his prior letter with Mr. Langley on February 23, 2007 and was told that it had been forwarded to the Board. Id. On March 1, 2007, Mr. Orodenker acknowledged receipt of Plaintiff's letter to him and indicated that he had asked Mr. Langley "to turn the matter over to the Personnel Appeal Board" for review and response consistent with Urban League "process." Id. at p. 43.

On March 12, 2007, Plaintiff had an interaction with his supervisor, Ms. DiPrete, in his office. Plaintiff describes the interaction as an argument in which Ms. DiPrete acted "unprofessionally and condescending" to him. (Document No. 122-1 at ¶ 33). Plaintiff denies that he was insubordinate to Ms. DiPrete. Id. at ¶ 34. Ms. DiPrete has a different account of the interaction in which she describes Plaintiff as being "argumentative" and his tone as "aggressive."

---

[2] Plaintiff's letter also alleged discrimination in 2002 when the Urban League promoted Belinda Bermingham, a black female, to Director of the APP Unit over him and claimed that Ms. Bermingham had no specialized training and did not possess a college degree. (Document No. 132-21). However, Plaintiff presently does not dispute that Ms. Bermingham earned a degree in social work from Providence College in 1995. (Document Nos. 127 at ¶ 26 and 132-16 at p. 2). In any event, any claims in this case that such promotion was gender discrimination and violated Plaintiff's legal rights under Title VII and the RIFEPA are plainly time barred under the applicable statutes of limitation.

(Document No. 132-21 at pp. 8-9). She also labeled Plaintiff's behavior as "insubordination." Id. There was not a third-party present in Plaintiff's office to directly witness this interaction. However, a coworker, Ms. Michelle Wilson, documented in a Memorandum dated April 18, 2007 that she overheard Plaintiff on that occasion "responding to [Ms. DiPrete] in a manner that [she] thought was inappropriate." (Document No. 125-4).

On March 13, 2007, Plaintiff completed an Employment Discrimination Questionnaire with the Rhode Island Commission for Human Rights ("RICHR") in which he preliminarily outlined his claim of discrimination against the Urban League and Mr. Langley. (Document No. 132-21 at pp. 5-6). By letter dated April 27, 2007, the RICHR served a copy of Plaintiff's discrimination charge on the Urban League/Mr. Langley. (Document No. 115-25). The letter indicated that the charge was formally filed by Plaintiff on April 20, 2007. Id.

While the parties agree that Mr. Langley sent Plaintiff home from work at some point after the March 12, 2007 interaction with Ms. DiPrete, they disagree as to the date and the reason given. Plaintiff indicates that he was sent home on Monday, March 19, 2007, pending his hearing before the Personnel Committee. (Document No. 122-1 at ¶ 41). Defendants contend that Plaintiff was sent home on Friday, March 16, 2007, as a result of the argument with Ms. DiPrete. (Document No. 127 at ¶ 52).

The Urban League's Personnel Committee met on March 22, 2007. The agenda listed Plaintiff as a topic under Employee Related Matters. (Document No. 115-25 at p. 4). The meeting minutes note the fact that Plaintiff had been "Sent home and Filed with HR Commission" and also that "Termination [was] recommended." (Document No. 124-1). A separate document (Document No. 123-12) listed the following "Reasons for concern and recommendation of termination:"

-4-

a. Falsification of educational qualifications
   b. Accountability of time
   c. Insubordination
      i. Sending letters to key officials without permission or notification
   d. Reluctance to follow directives
   e. Misrepresentation of job title in the press (while running for public office)
   f. Disrespect and insubordination to immediate supervisor
   g. Send [sic] a letter to Board Chair and contacted a lawyer regarding his position within the Unit

By letter dated April 18, 2007, Mr. Langley notified Plaintiff that his employment with the Urban League was terminated. (Document No. 123-13). The following were listed as the reasons:

1. Your updated resume declares that you earned a B.A. degree that cannot be validated.
2. The recent internal program audit, accomplished by agency supervisors, clearly outlined that you [sic] work was not meeting the agency's expectation.
3. Your recent failure to follow agency protocol, i.e.,
   a. The letter you sent to the Chief Judge of the Family Court; although you were told that communications with individuals in such positions should come from the office of the CEO for the agency.
   b. Sending communications to the board chair without following agency protocol.
4. On Friday, October 12, 2001 you signed a probationary notice (see attached), advising you of expectations for future conduct.
5. Culminating all of the above items was your deliberate insubordination to the acting supervisor, on March 13, 2007.

**Summary Judgment Standard**

Summary judgment is appropriate if the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When deciding a motion for summary judgment, the Court must review the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. Cadle Co. v. Hayes, 116 F.3d 957, 959 (1st Cir. 1997).

Summary judgment involves shifting burdens between the moving and nonmoving parties. Initially, the burden requires the moving party to aver "an absence of evidence to support the nonmoving party's case." Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). Once the moving party meets this burden, the burden falls upon the nonmoving party, who must oppose the motion by presenting facts that show a genuine "trialworthy issue remains." Cadle, 116 F.3d at 960 (citing Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995); Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994)). An issue of fact is "genuine" if it "may reasonably be resolved in favor of either party." Id. (citing Maldonado-Denis, 23 F.3d at 581).

To oppose the motion successfully, the nonmoving party must present affirmative evidence to rebut the motion. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256-57 (1986). "Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, [or] unsupported speculation." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990). Moreover, the "evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve." Id. (quoting Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st Cir. 1989)). Therefore, to defeat a properly supported motion for summary judgment, the nonmoving party must establish a trialworthy issue by presenting "enough competent evidence to enable a finding favorable to the nonmoving party." Goldman v. First Nat'l Bank of Boston, 985 F.2d 1113, 1116 (1st Cir. 1993) (citing Anderson, 477 U.S. at 249).

**Discussion**

**A.      Failure to Promote**

In Counts I (RIFEPA) and III (Title VII), Plaintiff alleges that Defendants failed to promote him on the basis of his race and gender.  In particular, Plaintiff asserts that Defendants were aware of his interest in the position of the Director of the APP Unit and selected Ms. DiPrete, a white female, over him even though he had similar qualifications, more experience and more seniority at the Urban League.  Defendants raise several defenses.  They argue that Ms. DiPrete was only acting as interim Director when Plaintiff was terminated, that the Director position was posted and Plaintiff never applied for it, that Plaintiff was not qualified since he did not hold a college degree and that the successful candidate, Ms. DiPrete, was an "excellent employee" with a college degree, unblemished work record at the Urban League and seven years' experience in the APP Unit.

To survive summary judgment and establish a prima facie case in a failure to promote case, Plaintiff must produce evidence on four points: (1) he is a member of a protected class; (2) he applied for an open position; (3) he was not selected; and (4) his employer filled the position by hiring another individual with similar qualifications.  Rathbun v. Autozone, Inc., 361 F.3d 62, 71 (1st Cir. 2004) (citing Gu v. Boston Police Dep't, 312 F.3d 6, 11 (1st Cir. 2002)).  If Plaintiff does so, "[t]he burden of production then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its employment decision[s]."  Id.  If it does, the burden reverts to Plaintiff to show that the employer's proffered reasons are pretextual.  Id. at 72.  "At all times, the plaintiff bears the 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'"  Gu, 312 F.3d at 11 (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)).

Putting aside the parties' dispute about whether Ms. DiPrete was truly the "interim" Director and the circumstances and timing of the job posting for the Director position, Plaintiff's submissions are not sufficient to avert summary judgment. The undisputed facts do not support a finding that Plaintiff was similarly qualified to Ms. DiPrete, that Defendants' proffered reasons for selecting Ms. DiPrete were pretextual or that the decision to promote Ms. DiPrete was the product of unlawful discrimination.

Although Plaintiff claims that the promotional decision was the result of both race and gender discrimination, he conceded that a black male and a black female served as two of the past six Directors of the APP Unit. (Document No. 127 at ¶ 4). When Plaintiff was hired in 1998 by Mr. Langley, a black male, he was assigned to the APP Unit under the supervision of Dr. Jesse Jordan, a black male, who held the position of Associate Director which was the highest position in APP at the time. Id. at ¶ 3.

In 2000, Ms. Belinda Bermingham, a black female, was hired as Director of the APP Unit. Plaintiff claimed discrimination at that time – presumably gender since he is of the same race as Ms. Bermingham. Plaintiff alleged that Ms. Bermingham had "no specialized training and did not possess a college degree." (Document No. 128-2 at p. 25). However, Plaintiff now concedes that the premise of that complaint was false because Ms. Bermingham is an honors graduate from Providence College with a Bachelor's Degree in social work. (Document No. 127 at ¶¶ 25-26).

As to Ms. DiPrete, Plaintiff conceded in his deposition that he did not think he was more qualified than her. Id. at ¶ 33. It is also undisputed that Ms. DiPrete earned a Bachelor's Degree from the University of Rhode Island in 1990 and had some prior relevant work experience. Id. at ¶ 34 and Document No. 132-20 at pp. 4-6. In his February 14, 2007 letter to Ms. Thompson,

Plaintiff asserted that he had eight years tenure in the APP Unit and thus more tenure than Ms. DiPrete. (Document No. 128-2 at p. 25). However, he now concedes that he was wrong and that Ms. DiPrete actually had almost seven years' tenure in the APP Unit while his totaled only four and one-half years. (Document No. 127 at ¶¶ 31-32). It is also undisputed that Plaintiff had previously been the subject of disciplinary action during his initial period of employment in the APP Unit. Id. at ¶¶ 16-17.

Finally, it is undisputed that Ms. DiPrete possessed a college degree and Plaintiff did not. It is also undisputed that Plaintiff falsified the resume he provided to the Urban League when he was hired, to misrepresent that he had earned a college degree from AIC and attended from 1985-1990. (Document No. 128-1 at p. 33). After he had been hired by the Urban League, Plaintiff revised his resume to change the dates of attendance at AIC to 1980-1985 but it still misrepresented that he earned a degree. Id. at p. 34. After he was terminated from the Urban League in 2007, his resume was revised to again change the dates of attendance to 1980-1984 but it still misrepresented that he earned a degree. Id. at p. 35. Finally, the record includes a version which accurately indicates that Plaintiff attended AIC from 1980-1982 and ambiguously notes that he had a "Major Concentration: Business Administration." Id. at p. 36. However, a review of the actual academic transcripts reveals that (1) Plaintiff failed the one summer course he took at URI; (2) he attended AIC for only three semesters and earned a total of fifteen credits; (3) he failed, or failed to complete, ten out of the fourteen courses he enrolled in at AIC (excluding one-credit, physical education courses he took each semester); and (4) despite his representation on later resumes that he had a "Major Concentration: Business Administration" at AIC, he took only one introductory business course in the spring semester of 1982 which he did not complete. (Document Nos. 132-13 and 132-14). He

-9-

was placed on probation with unsatisfactory standing by AIC in January 1981 after his first semester and later dismissed from AIC in 1982 for poor academic performance. (Document No. 132-14 at p. 4). Moreover, there are several other inconsistencies concerning Plaintiff's work history prior to 1997 between these versions of Plaintiff's resume which also call into question his credibility. (Document No. 128-1 at pp. 33-36).

Even assuming Plaintiff could show that Defendants were aware of his interest in the Director position and rigged the process for Ms. DiPrete, Plaintiff has failed to identify sufficient competent evidence to support the inference that the decision to promote Ms. DiPrete, and not him, to the Director position was infected by unlawful race and/or gender discrimination. Thus, Defendants are entitled to summary judgment on Plaintiff's claims (Counts I and III) alleging discriminatory failure to promote.

### B. Retaliation Claims

The majority of Plaintiff's remaining claims (Count II (RIFEPA – R.I. Gen. Laws § 28-5-7(5)), Count IV (Title VII – 42 U.S.C. § 2000e-3(a)) and Count VII (RIWPA – R.I. Gen. Laws § 28-50-3(4))) allege that he was fired in retaliation for protected conduct, i.e., complaining about employment discrimination to his employer and later filing a charge of employment discrimination with the RICHR. The rubric for consideration of such a claim is well established. To establish unlawful retaliation, a plaintiff must prove that (1) he engaged in protected conduct; (2) he experienced an adverse employment action after or contemporaneous with such conduct; and (3) there was a causal connection between the protected conduct and the adverse employment action. Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 25 (1st Cir. 2004) (citing Gu, 312 F.3d at 14).

Under Title VII and RIFEPA, it is unlawful to discriminate in any manner against any individual because he has opposed any practice forbidden by such anti-discrimination statutes. See 42 U.S.C. § 2000e-3(a); R.I. Gen. Laws § 28-5-7(5). Similarly, RIWPA makes it unlawful to discriminate against an employee because he reports verbally, or in writing, to his employer or supervisor a violation, which the employee knows or reasonably believes has occurred or is about to occur, of any state or federal law or regulation. See R.I. Gen. Laws § 28-50-3(4). While Plaintiff "need not establish that the conduct [ ]he opposed was in fact" unlawful discrimination, he must demonstrate "a good faith, reasonable belief that the underlying conduct violated the law." Moberly v. Midcontinent Commc'n, 711 F. Supp. 2d 1028, 1044 (D.S.D. 2010) (citation omitted); see also Krasner v. HSH Nordbank AG, 680 F. Supp. 2d 502, 520 (S.D.N.Y. 2010). "[P]laintiff's burden under this standard has both a subjective and an objective component." Murphy v. City of Aventura, 616 F. Supp. 2d 1267, 1282 (S.D. Fla. 2009) (plaintiff must not only subjectively believe in good faith that his employer engaged in an unlawful employment practice, but also his belief must be objectively reasonable in light of the facts and record presented).

Given this standard, it is possible (although rare) for an employee's underlying claim of discrimination to fail but for his related retaliation claim to succeed if he has a good faith but mistaken belief that his employer's conduct violated the law and his "mistaken belief was objectively reasonable." Murphy, 616 F. Supp. 2d at 1282 (describing such situations as "close cases"); see also Quinn v. Green Tree Credit Corp., 159 F.3d 759, 769 (2d Cir. 1998). Drawing all reasonable inferences in Plaintiff's favor, the record is sufficient to establish, for purposes of this Motion, that Plaintiff has presented a trialworthy claim that his February 14, 2007 "formal complaint" to the Urban League's Director of Human Resources alleging workplace discrimination,

his subsequent letter to the Urban League's Board Chairman (also attaching a copy of the February 14, 2007 letter), and his RICHR charge of discrimination, constituted protected conduct; i.e., a complaint based on a mistaken but good faith, reasonable belief that Defendants' conduct violated state and/or federal anti-discrimination laws.

Defendants cannot dispute that Plaintiff suffered an adverse employment action when he was "sent home" from work and subsequently terminated from employment on April 18, 2007. Defendants also cannot dispute the temporal proximity between Plaintiff's protected conduct and his termination. Rather, Defendants focus their argument on the causal connection prong. Defendants contend they have "set forth a legitimate, non discriminatory reason" for the employment decision and that "[t]here was no casual [sic] connect between the Plaintiff's alleged protected activity and his discharge but instead the Urban League terminated him primarily because of his insubordination to his supervisor Patricia DiPrete." (Document No. 131-1 at pp. 13-14) (emphasis added).

While Defendants are correct that engaging in protected conduct does not give an employee "immunity from violating employer/company rules," (Document No. 131-1 at p. 13), there are genuine issues of material fact in this case which preclude summary judgment as a matter of law. First, Defendants' argument is premised on the "fact" that Plaintiff was insubordinate to Ms. DiPrete on March 12, 2007. However, this remains a disputed factual issue at this point in the case. The circumstances of the March 12, 2007 incident are the subject of conflicting memos and affidavits authored by Plaintiff and Ms. DiPrete.[3] In his Affidavit, Plaintiff denies that he was insubordinate

---

[3] Neither Plaintiff nor Ms. DiPrete identified any direct witnesses to the incident. Defendants submit an unsworn "Incident Report" prepared over a month later on April 18, 2007 by a coworker who indicates that she overheard some of Plaintiff's comments which she described as "inappropriate" and "shouting." (Document No. 125-4). However, in her memorandum regarding the incident, Ms. DiPrete indicates that she also responded to Plaintiff "with

to Ms. DiPrete and asserts that she was the one who acted unprofessionally on March 12, 2007. (Document No. 122-1 at ¶¶ 32-35). He also sent a memo to the Urban League's Director of Human Resources, Ms. Leslie Thompson, on March 12, 2007 with his version of the conversation in which he described Ms. DiPrete as being "very agitated" and "rude" to him. (Document No. 123-8). He also indicates that "[n]either Mr. Langley, nor Ms. Thompson, nor anyone from the Personnel Committee ever talked to me about the March 12, 2007 incident between me and Ms. DiPrete." (Document No. 122-1 at ¶ 36). On the other hand, in her Affidavit, Mr. DiPrete indicates that Plaintiff "acted in a grossly insubordinate manner" and was "disrespectful" during the March 12, 2007 incident. (Document No. 131-2 at ¶¶ 6-9). She also indicated that Plaintiff yelled and pointed his finger downward at her. Id. at ¶ 8. Ms. DiPrete also sent a memo to Ms. Thompson on March 13, 2007 in which she summarized her version of the incident. (Document No. 132-21 at pp. 8-9).

Defendants argue that Plaintiff was terminated "primarily" due to insubordination. (Document No. 131-1 at pp. 13-14). However, on this record, there remain factual issues as to whether or not Plaintiff was insubordinate and the motivating reason(s) for his termination. The Urban League's Personnel Committee considered Plaintiff's employment situation at its March 22, 2007 meeting and referenced the fact that he "filed with [the] HR Commission." (Document No. 124-1). A separate document listed several "reasons for concern and recommendation of termination." (Document No. 123-12). Although insubordination is included on the list, it also references the fact that Plaintiff "sen[t] a letter to Board Chair and contacted a lawyer regarding his

---

a raised voice." (Document No. 132-21 at p. 9). Also, Defendants submit the Affidavit of another employee, Toni Roderick, who describes a prior incident in 2006 in which she states that Plaintiff told her that he had "just got in that bitch's face" and that Ms. DiPrete left shortly thereafter appearing upset and looking as if she may have been crying. (Document No. 131-3). Neither piece of evidence is sufficient at the summary judgment stage to carry the day for Defendants and resolve this disputed fact issue in their favor.

position within the Unit." Id. Drawing all reasonable inferences in Plaintiff's favor, as the Court must in considering this Motion for Summary Judgment, it is reasonable to conclude that the Personnel Committee was referring to Plaintiff's late February 2007 letter to Mr. Orodenker complaining about alleged discrimination at the Urban League. (Document No. 128-1 at p. 42).

Similarly, although Plaintiff's termination letter from Mr. Langley references the alleged incident of insubordination, it also lists "sending communications to the board chair without following agency protocol" as a reason for termination. (Document No. 123-13).[4] Defendants argue in their brief that "[i]t is clear from the facts that [Plaintiff] was terminated because of insubordination on March 12, 2007." (Document No. 131-1 at p. 27). However, since the Personnel Committee's Minutes (Document No. 124-1) and the termination letter sent to Plaintiff by Mr. Langley (Document No. 123-13) each list several reasons for termination, the record is not as clear as suggested by Defendants. Although the incident of alleged insubordination is listed, several others are also listed, including Plaintiff's letter to Mr. Orodenker complaining about unlawful workplace discrimination.

Defendants contend that insubordination was the "culminating" or motivating reason, i.e., the last straw, and that the other reasons evidence a pattern of poor work performance dating back to Plaintiff's resume fraud when hired by the Urban League several years earlier. Plaintiff counters that he presents a trialworthy retaliation claim based on direct, "smoking gun" evidence, i.e., the identification of protected conduct (Plaintiff's letter to Mr. Orodenker) as a reason for termination,

---

[4] In an effort to present an ambiguity, Defendants point out that the April 18, 2007 termination letter does not specify which particular communication from Plaintiff to the Board Chair is being referenced. (Document No. 133 at p. 2). However, at this stage, the Court must draw all reasonable inferences in Plaintiff's favor, and it is reasonable to infer that the termination letter is referencing Plaintiff's late February 2007 letter to Mr. Orodenker complaining about workplace discrimination.

and on other circumstantial evidence of retaliatory animus including the temporal proximity between the protected conduct and termination. Applying either the traditional pretext analysis under McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), or a mixed-motives analysis under Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003), Defendants have not established the absence of any genuine issues of material fact as to Plaintiff's retaliation claims.

Again, drawing all reasonable inferences in Plaintiff's favor, the evidence at this stage can be interpreted to suggest that Plaintiff's protected conduct may have played a part in the termination decision and thus summary judgment on Plaintiff's retaliation claims is not appropriate. Based on this record, it is the province of a jury, and not this Court, to weigh the evidence and consider if Plaintiff engaged in protected conduct and, if so, to what extent the decision to terminate Plaintiff's employment may have been the result of retaliatory animus.

**Conclusion**

For the foregoing reasons, I recommend that Defendants' Motion for Summary Judgment (Document No. 131) be GRANTED as to Counts I, III, V and VI and DENIED as to Counts II,[5] IV and VII. Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of the Court within fourteen (14) days of its receipt. See Fed. R. Civ. P. 72(b); LR Cv 72. Failure to file specific objections in a timely manner constitutes waiver of the right to review by the District Court and the right to appeal the District Court's decision. See United States v. Valencia-

---

[5] Counts IV (Title VII Retaliation) and VII (RIWPA Retaliation) apply only to the Urban League. (See Document Nos. 12 and 51). The other remaining Count (Count II – RIFEPA Retaliation) applies to both the Urban League and Mr. Langley. While Plaintiff's RIFEPA clam against Mr. Langley is brought under R.I. Gen. Laws § 28-5-7(6) and asserts a distinct theory of liability from that of the Urban League, there remain factual issues as to Mr. Langley's level of involvement and influence in the termination decision which preclude summary judgment.

Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).


 /s/   Lincoln D. Almond
LINCOLN D. ALMOND
United States Magistrate Judge
May 17, 2011